IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BorgWarner PDS Irapuato S. de R.L. de C.V., *a Mexican Corporation* | ) ) ) | Case No. |
| | ) | Hon. |
| Plaintiff, | ) | |
| v | ) ) | |
| Parker Hannifin Corporation, *an Ohio Corporation*, | ) ) ) | |
| Defendant. _____/ | ) ) ) | |

**VERIFIED COMPLAINT**

Plaintiff BorgWarner PDS Irapuato S. de R.L. de C.V. ("BorgWarner"), states the following for its verified complaint against Defendant Parker Hannifin Corporation ("Parker"):

**Parties, Jurisdiction, and Venue**

1. BorgWarner is a Mexican corporation with its principal place of business in Mexico. BorgWarner operates a manufacturing plant in Irapuato, Guanajuato, Mexico.

2. Parker is an Ohio Corporation with its principal place of business in Cleveland, Ohio. Parker operates a manufacturing plant in Matamoros, Mexico.

3. BorgWarner's Terms and Conditions require this Court to apply the federal laws of Mexico, without regard to conflicts of law principles.

4. The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(4). BorgWarner is a citizen of a foreign state. Parker is a citizen of Ohio. The amount in controversy exceeds $75,000, exclusive of costs, interest, and attorney's fees.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1). Parker is headquartered in Cuyahoga County, Ohio.

### The Parties' Contracts

6. Effective October 1, 2021, BorgWarner, as buyer, and Parker, as seller, are parties to requirements contracts for the supply of bonded pistons (referred to as the "Parts"). The Parts are referenced by the parties and throughout the key documents as Part No. 181220BD and Part No. 181550PST. The requirements contracts are attached hereto as **Exhibit A**.

7. BorgWarner's Terms and Conditions are incorporated into the requirements contracts by reference. BorgWarner's Terms and Conditions are attached hereto as **Exhibit B**.

8. BorgWarner's Terms and Conditions, together with the requirements contracts are referred to as the "Agreements," and form the contracts between the parties.

9. Under the Agreements, BorgWarner is obligated to purchase, and Parker is obligated to supply, BorgWarner's requirements for the Parts, which BorgWarner incorporates into clutches that it supplies just-in-time to its original equipment manufacturer ("OEM") customer, Ford Motor Company.

10. BorgWarner ships the clutches to Ford's Sharonville Transmission Plant located near Cincinnati, Ohio, which are then ultimately assembled into the F-250 and F-350, a process that takes place in part at Ford's Ohio Assembly Plant near Cleveland, Ohio.

11. BorgWarner issued the Agreements to Parker, and Parker accepted the Agreements through, among other things, manufacturing and shipping the Parts subject to the Agreements. (Ex. B, § 1 ("Written acceptance of this Purchase Order, or commencement of performance of any work or services pursuant to this Purchase Order, will constitute acceptance of this Purchase Order.").)

12. The Agreements have a term that lasts for the duration of the OEM's program production life, and Parker is expressly bound to continue supplying BorgWarner's requirements as ordered for the duration of that term. (Ex. B, § 1 ("[T]his Purchase Order is a contract under which Buyer will purchase and Seller will sell all . . . of the goods or services specified for the length of the applicable manufacturer's program production life . . . as determined by the original equipment manufacturer.").)

13. The Agreements require timely delivery of all Parts ordered by BorgWarner. (Ex. B, § 5 ("Deliveries must be made both in quantities and at times specified on the face of this Purchase Order or in Buyer's schedules and time is of the essence.").)

14. This requires Parker to deliver all Parts ordered by BorgWarner on time and in the quantities ordered, and the parties agreed to payment terms as follows: "Due the 2nd day of the 2nd month." (Ex. A.)

15. The Agreements further fix the price at which Parker may sell the Parts to BorgWarner. (*Id*. ("This order and/or releases against this order are not to be filled at higher prices than shown on Purchase Order or released without written approval of buyer."); Ex. B, § 3 ("This Purchase Order must not be filled at prices higher than those specified on the Purchase Order, unless otherwise agreed to in writing by the Buyer.").)

16. Indeed, Parker expressly agreed to provide the Parts to BorgWarner "in accordance with the characteristics, dates, quality, activities program, locations, requirements, means, prices, costs and any other specifications described in the Purchase Orders." (Ex. B, § 6.)

17. The Agreements further require Parker to indemnify BorgWarner for Parker's breach of the Agreements. (Ex. B, § 22.)

**Parker Breaches the Agreements**

18. On February 17, 2021, BorgWarner and Parker executed a non-binding letter of intent regarding the Parts, and shortly thereafter, BorgWarner issued requirements contracts for the Parts.

19. Those requirements contracts specified Part prices of $3.097 and $5.312.

20. Beginning in June 2021, Parker shipped Parts to BorgWarner pursuant to weekly releases as contemplated by the requirements contracts.

21. Parker then demanded that BorgWarner agree to price increases. In or around October 2021, BorgWarner and Parker agreed to a price increase, but BorgWarner made clear that any other price increase was not accepted. (Ex. C.)

22. On November 26, 2021, BorgWarner's Valeria Olvera sent revised requirements contracts to Parker's Glenn Whitten, with an effective date of October 1, 2021. (Ex. D).

23. These requirements contracts (which govern the parties' relationship as of October 1, 2021) reflected the Part price increases to $3.941 and $7.323. (*See supra* ¶¶ 6-17.)

24. Beginning on January 4, 2022, Parker continued to ship Parts to BorgWarner without objection pursuant to weekly releases as contemplated by the requirements contracts.

25. On January 10, 2022, Parker sent a Notice of Termination to BorgWarner, citing BorgWarner's refusal to agree to yet an *additional* price increase. (Ex. E.)

26. On February 1, 2022, BorgWarner responded to Parker's Notice of Termination, clarifying that BorgWarner had previously agreed to the October 2021 price increase and had re-issued revised requirements contract for the Parts. (Ex. F.)

27. On February 8, 2022, Parker responded by demanding BorgWarner "update [its] P.O. to the new prices." (Ex. G.)

28. On February 17, 2022, BorgWarner responded by demanding adequate assurances from Parker under UCC § 2-609, ordering Parker to confirm that it would honor its contractual obligations under the Agreements, which required Parker to supply the Parts "at prices [not] higher than those specified on the Purchase Order, unless otherwise agreed to in writing by the Buyer." (Ex. H.)

29. On February 25, 2022, Parker responded, but rather than provide adequate assurances, Parker reiterated that "all purchase orders and releases be updated so that you do not create an interruption to your supply." (Ex. I.) If BorgWarner failed to do so, Parker threatened that effective March 7, 2022, "a 'Credit Hold' will be placed upon your account until such time of full payment. At that time, we will continue to ship only with cash in advance payments." (*Id.*)

30. On March 14, 2022, Parker carried through on its threats. According to the Agreements, Parker was to deliver a shipment of Parts to BorgWarner. But Parker refused, withholding both the Parts for which Parker had demanded an extra-contractual price increase *and* additional parts that had not previously been at issue.

31. Parker has thus breached the parties' agreements and fully repudiated the parties' Agreements on multiple occasions. Parker has also refused to provide BorgWarner with any assurances that Parker will continue to ship Parts in accordance with the Agreements.

32. Should this continue, BorgWarner will begin to run out of Parts needed to produce clutches for Ford on or about March 30, 2022.

33. BorgWarner currently estimates that Ford will begin to experience shortages and line shutdowns roughly one-week later.

**Parker's Refusal to Ship Parts at the Agreed Price
Requires Injunctive Relief**

34. BorgWarner incorporates the Parts into clutches that BorgWarner sells to Ford on a just-in-time basis.

35. Just-in-time delivery in the automotive industry requires that Parker produce and deliver the Parts to BorgWarner on a timely basis so that BorgWarner can produce and deliver component parts to Ford on a timely basis; otherwise, the entire supply chain falters, reducing or potentially stopping production at BorgWarner and Ford's plants, including Ford's Ohio Assembly Plant. Such reductions and shutdowns would affect suppliers up and down the supply chain too.

36. The just-in-time delivery model that is standard in the automotive industry means that neither BorgWarner nor its customers have a sufficient inventory of excess Parts or clutches.

37. As Parker is aware, BorgWarner requires customer approval for its supply of the clutches. As a result, BorgWarner cannot replace Parker with another Parts supplier in time to avoid supply chain disruptions.

38. Because of this just-in-time supply chain, any delay in delivery of the Parts or a delivery of less than the required quantities of the Parts can lead to a shutdown of manufacturing up and down the supply chain.

39. Parker knows that abruptly reducing deliveries of the Parts will cause catastrophic harm to BorgWarner and Ford. Indeed, BorgWarner advised Parker of this potential harm on several occasions.

40. Such catastrophic harm will include, but is not limited to, BorgWarner and Ford stopping production for clutches and vehicles. These production stoppages would result in BorgWarner and Ford sending employees home and incurring hundreds of thousands to millions of dollars per hour in reduction or stoppage costs. The greater public would also suffer. Any

reduction or stoppage would drastically increase the cost of the F-250 and F-350 in an already tight and inflationary market, perhaps precluding consumers from purchasing these trucks altogether.

41. BorgWarner would also suffer irreparable harm to its goodwill and reputation in the automotive industry in the event Parker reduces delivery of the Parts.

42. BorgWarner is left with no recourse but to seek immediate relief from this Court to avoid irreparable harm.

## COUNT I
### Breach of Contract

43. BorgWarner incorporates by reference in this Count I all preceding allegations in this Complaint.

44. BorgWarner and Parker have valid and mutually binding contracts that require Parker to supply BorgWarner with all ordered quantities of the Parts at the prices set forth in the Agreements.

45. BorgWarner has fulfilled all of its contractual obligations under the Agreements.

46. Parker's failure to timely deliver the ordered quantities of Parts to BorgWarner at the prices and on the terms set forth in the Agreements is a breach of Parker's contractual obligations.

47. BorgWarner has or will suffer damages in an amount greater than $75,000 as a result of Parker's breaches, including costs and fees to-be incurred to BorgWarner's customers, any resulting alleged liability imposed upon BorgWarner by BorgWarner's customers, damage to BorgWarner's business reputation, and attorneys' fees and costs.

## COUNT II
### Declaratory Judgment

48. BorgWarner incorporates by reference in this Count III all preceding allegations in this Complaint.

49. There is an actual case in controversy between the parties for which declaratory judgment is appropriate under 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57.

50. Parker has contractual obligations to continue to supply the Parts to BorgWarner under the Agreements at the prices agreed upon in the Agreements.

51. BorgWarner has fully complied with all of its obligations under the Agreements and has not breached the Agreements.

52. The consequence of this disagreement between BorgWarner and Parker is significant, as it could result in Parker further reducing or even ceasing shipments of Parts to BorgWarner at any moment. The consequence of such an action could be a shutdown of automotive production at Ford.

53. To avoid this significant public and private harm, and to provide the parties with needed clarity regarding the extent of their contractual obligations, BorgWarner requests a declaratory judgment that the parties' are bound by the Agreements, which require Parker to supply BorgWarner with the quantities of Parts as ordered by BorgWarner and at the contractual prices.

### **Relief Requested**

BorgWarner requests the following relief from this Court:

A. Injunctive relief preventing Parker from taking any action inconsistent with its supply obligations to BorgWarner under the Agreements;

B. An order of specific performance and/or mandatory injunction requiring Parker to continue to supply BorgWarner with the ordered quantities of the Parts under the Agreements and at the prices agreed upon in the Agreements;

    C.    A judgment declaring that the parties' are bound by the Agreements, which require Parker to supply BorgWarner with the quantities of Parts as ordered by BorgWarner and at the contractual prices;

    D.    Monetary damages suffered by BorgWarner due to Parker's actions;

    E.    An award of attorney's fees and other costs arising out of Parker's breaches under the Agreements (*see* Ex. B, §13); and

    F.    All other relief as the Court may deem just, equitable or appropriate under the circumstances.

Dated: March 17, 2022

By: */s/ Robert B. Port*
Robert B. Port (0078329)
Ann E. Knuth (0066718)
HAHN LOSESER & PARKS LLP
200 Public Square, Ste. 2800
Cleveland, Ohio 44114
216.274.2316
rport@hahnlaw.com
aknuth@hahnlaw.com

Michael G. Brady (P57331)
Adam T. Ratliff (P79892)
WARNER NORCROSS + JUDD LLP
2715 Woodward Ave., Ste. 300
Detroit, Michigan 48201
313.546.6000
mbrady@wnj.com
aratliff@wnj.com

*Attorneys for Plaintiff*

## Verification

I declare under penalty of perjury that the contents of the foregoing complaint are true and accurate to the best of my knowledge, information, and belief.

Executed on: March 17, 2022

_____
Valeria Olvera
Purchasing
BorgWarner PDS Irapuato S. de R.L. de C.V.